## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE INSURANCE HOUSE, INC.,<br>a Georgia Corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>INSURANCE DATA PROCESSING, INC.,<br>a Pennsylvania Corporation,<br><br>    Defendant. | Civil Docket No.<br>1:08-mc-00094-SLR<br><br>Northern District of Georgia<br>Case No. 1:07-CV-00286-BBM |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL DOCUMENTS FROM THIRD PARTY ACE AMERICAN INSURANCE CO.

### I.    INTRODUCTION

Throughout the discovery period in the underlying litigation, IDP's employees repeatedly identified Ace as a party likely to have documents directly relevant to the parties' claims and defenses. Based on that deposition testimony and supporting documents, The Insurance House, Inc. ("IH") served Ace with a subpoena for documents on March 19, 2008 (the "Subpoena"). IH tailored the Subpoena to be minimally intrusive and, therefore, sought only nine categories of documents directly relevant to the parties' claims and defenses.

Ace responded by flatly refusing to produce any documents whatsoever. In doing so, Ace relied upon a lengthy series of objections, which include virtually every objection to the production of documents available under Rule 45. Apparently, Ace hopes that by arguing the applicability all objections, the Court will embrace at least one.

In fact, all of Ace's objections are unfounded. Ace has documents highly relevant to the parties' claims and defenses, and because IH can not obtain those documents through any other

13402035.2

1848323.1

source, Ace should be compelled to comply with the Subpoena.

Additionally, Ace's concerns regarding its confidentiality are misplaced. Ace argues that the Subpoena requires it to produce documents containing Ace's confidential and proprietary information. This is false. IH does not seek, and is not interested in, Ace's confidential or proprietary information. The Subpoena does not target that information, and IH has not requested that information. Specifically, the Subpoena does not seek Ace's business processes, rating algorithms, pricing materials, advertising information, and any information regarding Ace's insureds. To the extent that Ace's responsive documents include Ace's confidential and proprietary information, Ace is free to redact them and IH is also willing to work with Ace to ensure that Ace's materials are kept appropriately confidential. Ace's blanket refusal to produce any documents demonstrates that Ace's alleged concern about its confidentiality is merely a tactic employed to avoid complying with the Subpoena.

In short, Ace has documents that are clearly relevant to the issues raised in the underlying litigation but has refused to produce any documents in response to the Subpoena. Ace waived any objections that it might have had to the Subpoena by failing to timely raise them. And, even if those objections had been timely raised, Ace's numerous objections fail to raise any legitimate basis to preclude enforcement of the Subpoena. As a result, IH respectfully submits that the Court should grant its Motion to Compel against Ace.

## II.    FACTUAL BACKGROUND

In accordance with an Order entered by Judge Martin in the underlying litigation, IH coordinated discovery from IDP's customers, including Ace, through counsel for IDP. (Ace's Resp. Ex. F). Using contact information provided by IDP, on March 19, 2008, IH properly served Ace with the Subpoena and a cover letter which explained that, "through counsel for

Insurance Data Processing, Inc., you have agreed to accept the service of this subpoena by Federal Express," and further requested that "[i]f this is incorrect, please let us know immediately." (Motion To Compel Ex. A).   Ace did not do so.[1]

On April 1, 2008, the deadline for Ace to respond and/or object to the Subpoena, Douglas A. Stuart,[2] counsel for Ace, contacted IH by phone.[3]  (Hession Decl. ¶ 6, annexed as Exhibit A hereto).  Mr. Stuart represented that Ace was not sure that they could search for and gather responsive documents before the end of the day, as was required by the Subpoena, and therefore requested an extension of thirty (30) days in which to respond.  (Hession Decl. ¶¶ 7-8).  Mr. Hession did not consent to a 30-day extension, but offered to allow Ace an additional ten to fourteen days.  (Hession Decl. ¶ 9).  Mr. Stuart did not accept this offer.  Instead, he stated that he would contact IH once he determined who would be handling Ace's response and identifying responsive documents.  (Hession Decl. ¶ 10).  Mr. Stuart did not contact IH again. (Hession Decl. ¶ 11).

On April 17, 2008, an Ace paralegal, Adrienne M. Logan, spoke with Almeda Howard, a paralegal for IH's counsel, raised no objections, and explained that Ace was still searching for responsive documents.  (Mot. To Compel Ex. B).  Despite the assertions of Ace and Ms. Logan to the contrary, Ms. Logan did not tell Ms. Howard that Ace did not know what their response

---

[1] Ace first raised a service objection only on June 3, 2008, in its Response to IH's Motion to Compel.

[2] Although Mr. Stuart's Declaration purports to be an Affidavit, because the statement is unsworn, it is, in actuality, a declaration.  It is therefore referred to hereinafter as the Stuart Declaration.

[3] IH acknowledges that Messrs. Stuart and Hession traded voicemails the previous day, March 31, 2008. (Hession Decl. ¶ 5).

to the Subpoena would be.  (Logan Decl. ¶ 9;[4] Ace's Resp. at 6; Second Howard Decl. ¶ 8, annexed as Exhibit B hereto).  Instead, Ms. Logan told Ms. Howard that Ace's search for documents was in progress, that they had not yet located responsive documents, but that they had not yet had adequate time to search. (Second Howard Decl. ¶¶ 9 & 10).  IH agreed to grant Ace an extension of time to continue searching.  (Howard Decl. ¶ 4.)

On April 18, 2008, Ace claimed for the first time that it was still entitled to object to the Subpoena.  (Mot. To Compel Ex. C).  On April 24, 2008, Ace responded to the Subpoena by providing only a list of objections; Ace refused to produce a single responsive document. (Mot. To Compel Ex. D).

## III.    LEGAL ARGUMENT

### A.    Ace Waived Its Objections.

Ace's objections were waived on April 1, 2008 when it failed to timely respond.  See Fed. R. Civ. P. 45(c)(2)(B) ("objection[s] *must* be served before the earlier of the time specified by compliance or 14 days after the subpoena is served.") (emphasis added).  IH's allowance of additional time – made in good faith to allow Ace to search for responsive documents – did not revive those objections.  (Howard Decl. ¶¶ 4-5; Second Howard Decl. ¶¶ 8-10).  Notably, Ace did not claim that this extension had also preserved its right to object until April 18, 2008, more than two weeks later.   (Mot. To Compel Ex. C).

Ace's contention that IH failed to rebut that claim is also erroneous.  Ace's Friday, April 18, 2008 attempt to revive its objections was received by IH on Monday, April 21, 2008.

---

[4] Although Ms. Logan's Declaration purports to be an Affidavit, because the statement is unsworn, it is, in actuality, a declaration.  It is therefore referred to hereinafter as the Logan Declaration.

13402035.2

1848323.1

Before IH could respond to contest this astonishing position, IH received Ace's April 24, 2008 letter (sent by U.S. Mail and e-mail) which purported to assert Ace's objections. Upon receipt of Ace's letter, IH promptly responded, putting Ace on notice that its objections had long been waived. (Mot. to Compel Ex. D).

Ace further claims that it has shown good cause for the Court to consider its untimely objections because Ace "believed it had an agreement with IH" and because of the Subpoena was allegedly overbroad. The only Delaware case Ace relies upon for this proposition, Celanese Corp. v. E.I. DuPont de Nemours & Co., 58 F.R.D. 606 (D. Del. 1973), does not support a finding of good cause in this case. The holding in Celanese was expressly limited to the facts of that case. Id. at 609. In Celanese, plaintiff's counsel engaged in eleventh months of discussion with the non-party prior to issuance of the subpoena, issued a subpoena seeking twenty-two categories of documents to which the non-party estimated it would take two years to respond, and then notified the non-party five days before production was due that they would not, as promised, narrow the subpoena's scope. Id. at 608-09. Despite this, the non-party timely produced one hundred and seventy (170) responsive documents. Id. at 609.

In contrast, the Subpoena in this case sought only nine, discrete categories of documents, which by Ace's own estimate could potentially be gathered in a few weeks time, (Hardy Decl. ¶ 23, annexed as Ex. A to Ace's Resp.), and Ace only attempted to contact IH for the first time the day before production was due. (Hession Decl. ¶ 5). Despite the forty-three (43) days ultimately allowed for compliance, Ace failed to produce a single document.

The facts of this case do not warrant a finding of good cause under Celanese. And, as this Court recognized in that case, absent facts showing good cause, "a party [such as Ace] who fails to abide by the procedural rules governing litigation does so at his own risk and peril." Id.

at 609.  IH asks this Court to compel Ace to produce responsive documents because Ace failed

to "abide by the procedural rules" and thereby waived its right to object.  Id.

> **B.      Even If Ace's Objections Are Considered,
> IH's Motion To Compel Should Be Granted.**

IH seeks reasonable, limited discovery well within that anticipated by Rule 45.[5]  Under

Rule 45, subpoenas "should be upheld unless it is clear 'that the evidence sought can have no

possible bearing upon the issues.'"  Dart Indus., Inc. v. Liquid Nitrogen Processing Corp. of

Cal., 50 F.R.D. 286, 292 (D. Del. 1970) ("[t]he 1946 amendment to Rule 45(b) gave the same

scope for production of documents as provided in Rule 26(b)") (citing Hercules Powder Co. v.

Rohm & Hass Co., 3 F.R.D. 302, 304 (D. Del. 1943)).[6]

Here, IH seeks documents which are directly relevant and has taken or offered to take

all available measures to minimize the burden to Ace in producing those documents.  For

example, IH remains willing to limit use of the documents produced by Ace under the

protective order in place in the underlying litigation or to implement any other protective

measures this Court sees fit, including, but not limited to, deposing a corporate representative of

Ace under Rule 30(b)(6) in order to further narrow the scope of documents sought.

Despite IH's numerous attempts to be courteous and cooperative, Ace has asserted every

possible objection under Rule 45 in a transparent attempt to avoid its obligation to produce

---

[5] Ace's argument that the Subpoena is a "fishing expedition" is misplaced and has been expressly rejected by the United States Supreme Court.  "No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. 495, 511 (1947).

[6] According to Rule 26(b), "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any parties claim of defense."  Fed. R. Civ. P. 26(b)(1).  This information need only "appear[] reasonably calculated to lead to the discovery of admissible evidence."  Id.

13402035.2

1848323.1

documents altogether.

### 1.    The Subpoena Targets Documents That Are Central to the Issues Presented in the Underlying Litigation.

In its Response, Ace argues that the Subpoena should be quashed because any documents produced by Ace would be irrelevant to the issues presented in the underlying litigation. Ace is incorrect. The legal arguments made by both parties to the underlying litigation have put Ace's documents at issue, and the deposition testimony has similarly identified Ace as having relevant documents.

### a.    Ace's Documents Are Relevant to IH's Claim for Fraud.

In the underlying litigation, IH has alleged that IDP made material misrepresentations to IH regarding the speed with which IDP could install its ACIES/one software product. IDP signed a license agreement with IH that obligated IDP complete its installation of ACIES/one by a specified deadline. During the discovery period in that case, several IDP officers testified that they knew – prior to the parties signing the parties' license agreement – that IDP could not meet that installation deadline.

Some members of IDP's senior management, however, testified that they optimistically believed that IDP could have met that installation deadline for IH. Those members identified IDP's previous installation for Ace as a shining example of IDP's ability to conduct a timely and efficient installation of ACIES/one for a customer.[7] Indeed, IDP's CEO testified that IDP installed 102 "state/line combinations" in seven months, and that Ace would say that IDP did "an

---

[7] Ace's response brief incorrectly argues that Ace licensed a separate product from IDP than did Insurance House. Admittedly, IDP customized its core ACIES/one product for Ace – as it did for Insurance House – but Ace licensed some of the very same ACIES/one modules that Insurance House licensed from IDP. (Croce Dep. 191:3-25, annexed as Exhibit C hereto).

amazing job."[8]  IDP's CEO also testified that Ace "would say very nice things about the ACIES

system; the speed with which the system was installed at Ace, the talent of our staff, [and] the

commitment to the client."[9]  At a minimum, IH should be able to test those representations by

examining Ace's documents on the subject.  This includes Ace's internal evaluations of IDP's

installation for Ace and any communications informing IDP of Ace's evaluations of IDP's work.

Moreover, Ace was IDP's first client for ACIES/one that was not also a business partner

of IDP in developing ACIES/one.[10]  In fact, Ace was also the only IDP client to actually

implement ACIES/one prior to IDP signing its contract with IH.[11]  As a result, Ace was in a

unique position among IDP's customers to provide an objective evaluation of the ACIES/one

product and IDP's installation prior to IH's involvement with IDP.  And, while IDP's CEO

testified that Ace believed IDP did "an amazing job" with its installation for Ace, IDP's

engagement manager responsible for IDP's installation for Ace testified that the deadline for IDP

to complete its installation of ACIES/one "evolved over time," i.e., it was pushed back.[12]  Ms.

Adams testified,

> I would say for – for Ace when they first started working with us we had a
> deadline to be in production and that deadline changed a bit through the project.
> So the beginning of the project it may have been projected to be one thing and in
> the end it was adjusted for different reasons.[13]

---

[8] (Gilbert Dep. 72:6-75:9, 87:3-21, relevant excerpts annexed as Exhibit D hereto).

[9] (Gilbert Dep. 207:17-22).

[10] (Gilbert Dep. 86:24-87:2).

[11] (Adams Dep. 107:1-108:3, relevant excerpts annexed as Exhibit E hereto).

[12] (Adams Dep. 87:20-88:17, 98:19-99:10).

[13] (Adams Dep. 99:3-10).

If IDP truly did "an amazing job" with its installation of ACIES/one for Ace, this evidence would potentially bolster IDP's argument that it believed that it could meet its delivery deadlines for IH. If, however, IDP's installation for Ace was rife with the same type of failures, delays, errors, and defects that IH experienced, then this evidence would bolster IH's claim that IDP was aware of its shortcomings with its product, staff, and methodology prior to the execution of its contract with IH, and therefore that IDP's misrepresentations were intentional.

**b.      Ace's Documents Are Relevant to IH's Misappropriation Claim.**

Additionally, IH has alleged in the underlying litigation that IDP misappropriated IH's intellectual property. Specifically, but without limitation, IH alleges that it co-developed certain web-rating functionality that IDP then incorporated into the ACIES/one product. In response, IDP argues that it developed that functionality prior to its involvement with IH. A dispute therefore exists regarding the contents of IDP's ACIES/one product prior to IH's contributions to it.

At deposition, IDP's employees testified that the only web-rating functionality that IDP had developed in connection with ACIES/one was developed for Ace.[14] Moreover, IDP's employees testified that IDP had demonstrated Ace's version of that functionality to IH at the very onset of IDP's relationship with IH.[15] As a result, Ace is in the unique position among IDP's customers of knowing what web-rating functionality it received from IDP and how that functionality differs from what ACIES/one currently includes. Ace's documents are therefore likely to shed light on this important, hotly disputed issue.

---

[14] (Adams Dep. 125:20-127:15).

[15] Id.

c.    **Ace's Documents Are Also Relevant**
**To IH's Claim For Breach Of Contract.**

IH has also alleged that IDP breached the parties' contract by failing to meet contractual deadlines for IDP's installation of ACIES/one. IDP does not dispute that those deadlines were missed, but instead argues that IH contributed to IDP's failure to perform. A central issue in the underlying litigation, therefore, is the allocation of blame for IDP's failure to meet its contract deadlines.

Any IDP failures in project management, failures in calculating installation schedules, or program defects in ACIES/one that Ace experienced is relevant to whether IDP was responsible for similar problems in its installation for IH. Because Ace was an ACIES/one client for whom IDP's installation deadlines were pushed back over time, IH respectfully submits that it should be entitled to receive documents from Ace that would explain those postponed deadlines and would be relevant to determining IDP's responsibility for its failure to meet installation deadlines for IH.

2.    **The Subpoena Is Neither Overbroad Nor Vague.**

The Subpoena targets documents in Ace's possession that shed light on issues central to the underlying litigation. The Subpoena does not target all documents in Ace's possession that involve its relationship with IDP, nor does the Subpoena target documents that IH has or could receive from IDP through discovery in the underlying litigation. As a result, IH respectfully submits that the Subpoena is not overbroad.

Additionally, Ace argues that the Subpoena is vague in that it fails to define "ACIES/one," "ACIES/one product," and related phrases. The uncontested testimony in this case, however, demonstrates that Ace was a client of IDP that licensed IDP's ACIES/one

- 10 -

product.  Ace's Response admits as much.  (Ace's Resp. at 3).  It is unclear how Ace can license a product that both IDP and Ace referred to as "ACIES/one," put that product into production for a number of years, and then contend that it does not understand that term.

      3.      **The Subpoena Does Not Target Ace's Confidential or Proprietary Information.**

Ace argues that the Subpoena requires Ace to produce its confidential or proprietary information.  It does not.  Contrary to Ace's assertions, IH is not interested in obtaining any information from Ace related to Ace's policies or data related to pricing, rating algorithms, marketing, or information relating to Ace's insureds.  Moreover, the Subpoena does not target that information.

Further, to the extent that documents responsive to the Subpoena contain Ace's confidential information, IH would invite Ace to propose language to modify the protective order to afford Ace with the protection that it seeks.  Ace is also invited to redact its responsive documents as necessary to remove its confidential or proprietary information.  Alternatively, IH is willing to explore a separate protective order or confidentiality agreement to keep Ace's documents appropriately confidential.  Notably, however, Ace has not produced any documents whatsoever in response to the Subpoena.  It strains credibility to believe that all documents responsive to the Subpoena contain Ace's confidential or proprietary information.

      4.      <u>**Ace's Remaining, Hyper-technical Objections as to Form Are Meritless.**</u>

ACE further objects as to the form of the Subpoena on the grounds that (a) it called for responsive documents to be mailed to Georgia, rather than physically produced in Delaware; (b) it was served on Lucienne N. Hardy, rather than the registered agent, of Ace; and (c) the forty-three (43) days Ace had in which to comply were allegedly unreasonable.  These objections are hyper-technical, without merit, and, where appropriately raised by Ace, have already been

- 11 -

cured by IH.

### a.    Production of Documents to IH by Mail Was Appropriate.

Ace's objection on the grounds that the Subpoena required it to mail documents out of State is unrecognized in the Third Circuit. (Ace's Resp. 7-8). Ace argues, citing only to extra-jurisdictional case law, that by asking Ace to mail documents, at IH's expense, to a Georgia address, IH violated Rule 45(a)(2)(C), which provides that a subpoena must issue from the "district where the production or inspection is to be made"). There is no Third Circuit case law to support this objection.[16]

This same objection was recently rejected by another court in this Circuit in City of St. Petersburg v. Total Containment, Inc., 2008 WL 1995298, at *3 (E.D. Pa. May 5, 2008). In that case, the subpoena sought the production of documents located in the district from which the subpoena was issued, but, as in this case, called for the documents to be mailed to an out-of-state location. Id. The court found this objection to be "hypertechnical" and stated that "the geographic limitation in Rule 45(a)(2)(C) relates principally to the location of the documents to be produced, rather than the specified location on the subpoena." Id.; see also Hay, 360 F.3d at 412.

However, even if this Court were to find that production was "made" in the state of mailing, this alleged "defect" in no way prejudiced Ace, nor has Ace alleged any such prejudice. The Subpoena sought production by mail *at IH's expense*. Moreover, had Ace raised this concern with IH, it could easily been rectified. See McPhaul v. United States, 364

---

[16] The only Third Circuit opinion to address the effect of Rule 45(a)(2)(C) construed its language as requiring documents that were within a nonparty's control but outside the territory covered by the issuing court's jurisdiction to be produced. Hay Group, Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 412 (3d Cir. 2004).

U.S. 372, 382 (1960) (where one responding to a subpoena finds it to be defective, he should notify the requesting party so that the alleged defect may be remedied). To the extent this Court finds the Subpoena defective for seeking production by mail from Delaware to Georgia, IH remains willing to accept the production of responsive documents at the office of IH's Delaware counsel, Thomas G. Macauley.

### b.    Ace Waived Any Objection as to Service of the Subpoena on Lucienne N. Hardy.

To the extent Ace did not waived its objection as to which individual was served on Ace's behalf by failing to raise it prior to April 1, 2008, Ace nonetheless waived this objection by failing to raise it in Ace's April 24, 2008 objections. See Fed. R. Civ. P. 45(c)(2)(B). Rule 45(c)(2)(B) "require[s] the recipient of a subpoena to raise all objections at once, rather than in staggered batches, so that discovery does not become a 'game.'" DG Creditor Corp. v. Dabah, 151 F.3d 75, 81 (2d Cir. 1998) (citing United States v. Bryan, 339 U.S. 323, 331 (1950)). Despite raising numerous other objections in its April 24, 2008 letter, Ace failed to include any objection to service.

Ace's failure to raise this objection earlier is all the more egregious given that this issue was expressly addressed in the cover letter which accompanied the Subpoena. In relevant part, the letter provided: "This will confirm that, through counsel for Insurance Data Processing, Inc., you have agreed to accept service of this subpoena by Federal Express. If this is incorrect, please let us know immediately." See Mot. To Compel Ex. A. Ace did not do so, waiting instead until the filing of its Response to IH's Motion to raise this issue for the first time.

### c.    The Subpoena Provided Ample Time for Compliance.

Ace was allowed forty-three (43) days to respond the Subpoena. This allowed Ace more than enough time to locate and gather responsive documents, as has been recognized by

numerous other courts who have acknowledged lesser response periods as sufficient.  <u>See</u>
<u>Kupritz v. Savannah College of Art & Design</u>, 155 F.R.D. 84, 88 (E.D. Pa. 1994) (stating that
seven days notice would be reasonable); <u>Subair Systems, LLC v. Precisionaire Systems, Inc.</u>,
2008 WL 1914876, at *2 n.4 (S.D. Fla. Apr. 26, 2008) (acknowledging that ten days may be
reasonable); <u>Total Containment</u>, 2008 WL 1995298, at *2   (upholding a subpoena which
provided for thirteen days notice); <u>Washington v. Thurgood Marshall Academy</u>, 230 F.R.D. 18,
25 (D.D.C. 2005) (finding twenty-nine days reasonable).  Even if Ace were unable to complete
its search in the forty-three (43) days allotted, it seems unlikely that had Ace undertaken any
real effort to locate responsive documents – even as simple as running a search for "Acies" in
Ace's email database – during this time, at least a few responsive documents would have been
located and produced.   To date, however, Ace has not produced a single responsive document.

C.    <u>Ace Is Not Entitled to Reimbursement for All Expenses.</u>

Ace erroneously argues that it is entitled to compensation for "all" expenses.  (Ace's
Resp. 23).    In  fact,  courts  have  expressly  found  that  nonparties  are  not  entitled  to
reimbursement of "all" expenses, but rather, that they should be protected from incurring
"significant expense."  <u>Standard Chlorine of Delaware, Inc. v. Simibaldi</u>, 821 F. Supp. 232, 265
(D. Del. 1992); <u>see also</u> <u>In re Exxon Valdez</u>, 142 F.R.D. 380, 383 (D.D.C. 1992).  IH expressed
its willingness to do so in the cover letter accompanying the Subpoena, offering to reimburse
Ace for the costs associated with copying and shipping responsive documents.  <u>See</u> Mot. To
Compel Ex. A.  IH remains willing to do so.

This Court has previously found a reimbursement of fifty (50) cents per page produced
to compensate a nonparty reasonably for "all reasonable charges incurred in both producing and
copying [] documents."  <u>Standard Chlorine</u>, 821 F. Supp. 232, 265 n.34.   Despite this, Ace

claims that IH should also pay for its attorneys' fees but fails to cite to a single Third Circuit case in support of this position.[17]

Furthermore, the only attorneys' fees that appear to be at issue are those Ace incurred in responding to IH's Motion to Compel. Because this Motion was made necessary solely by Ace's unreasonable refusal to comply with the Subpoena, they should not be included in the reasonable expenses IH is required to reimburse. See Kentucky Speedway, LLC v. National Ass'n for Stock Car Auto Racing, Inc., 2007 WL 1201465, at *2 (D. Del. Apr. 23, 2007) (declining to award attorneys' fees to non-party incurred in responding to subpoenas and litigating cross motions to strike, transfer and compel).

---

[17] Ace does refer, in a string cite, to the Standard Chlorine's discussion of what the result would have been under the previous version of Rule 45, but Ace provides no indication of why the previous version of Rule 45 might be relevant in this case.

IV.        **CONCLUSION**

IH asks this Court to compel Ace to respond to the Subpoena as the documents sought are directly relevant to the underlying litigation, Ace's objections to the Subpoena were waived and, even if those objections are considered by this Court, they are unfounded and do not excuse Ace's failure to comply.  IH further asks that this Court order Ace to reimburse IH for the expenses incurred in making its Motion, including attorneys' fees, under Rule 37(a)(5)(A).

DATED:  June 13, 2008                    Respectfully submitted:

By:
Thomas G. Macauley  (ID No. 3411)
ZUCKERMAN SPAEDER LLP
919 Market Street, Suite 990
P.O. Box 1028
Wilmington, Delaware  19899-1028
Tel.: (302) 427-0400
Fax: (302) 427-8242

- and -

James J. Wolfson (Ga. Bar No. 773397)
Joseph F. Hession (Ga. Bar No. 349605)
Philip S. Bubb (Ga. Bar No. 092069)
Brooke Lewis (Ga. Bar No. 449989)
CARLTON FIELDS, P.A.
One Atlantic Center
1201 West Peachtree Street
Suite 3000
Atlanta, Georgia 30309
Phone: (404) 815-3400
Fax:    (404) 815-3415

Attorneys for Plaintiff,
THE INSURANCE HOUSE, INC.

- 16 -

1848323.1

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

THE INSURANCE HOUSE, INC.,  )
a Georgia Corporation,  )
        Plaintiff,  )
  )
  )    MISC. No. _____
    v.  )
  )    Northern District of Georgia
  )    Case No. 1:07-CV-00286-BBM
INSURANCE DATA PROCESSING, INC.,  )
a Pennsylvania Corporation,  )
        Defendant.  )
  )
  )
  )
AND RELATED COUNTERCLAIM.  )
  )
  )

## DECLARATION OF JOSEPH F. HESSION

I, JOSEPH F. HESSION, state and declare as follows:

1.    I am a shareholder with the law firm of Carlton Fields, P.A., counsel for The Insurance House, Inc. ("Insurance House") in this matter.

2.    I am over the age of 18, suffer from no disability affecting memory or judgment, and make this declaration of my own volition.

3.    I make this declaration in connection with Insurance House's Response to Third Party ACE American Insurance Company's Opposition to Plaintiff's Motion to Compel Documents.

4.    I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify competently about them.

5.    On or about March 31, 2008, I exchanged voicemails with Mr. Douglas

Stuart, but we were not able to reach one another.

6.    On or about April 1, 2008, I spoke with Mr. Stuart by phone.

7.    Mr. Stuart represented that Ace was not sure that they could search for and gather responsive documents before the end of the day as was required by the Subpoena.

8.    Mr. Stuart therefore requested an extension of thirty (30) days.

9.    I did not consent to a 30 day extension because IH had impending deadlines, i.e. the close of discovery, but I offered to allow Ace an additional ten (10) to fourteen (14) days.

10.    Mr. Stuart did not accept my offer of an additional ten (10) to fourteen (14) days, but stated that he would get back in touch with me once he determined who would be handling Ace's response and gathering/searching for documents.

11.    Other than the Declaration Mr. Stuart submitted in support of Ace's Response Brief, I did not hear from him again.

12.    On or about April 25, 2008, my associate Philip Bubb and I spoke with Paul Bech, counsel for Ace, by phone.

13.    During the April 25, 2008 conversation, I told Mr. Bech that Insurance House was not interested in the confidential business information of Ace and that Ace need not produce it.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this _____ day of June 2008, at Atlanta, Georgia.

Joseph F. Hession

# EXHIBIT B

419772.1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

THE INSURANCE HOUSE, INC.,                )
a Georgia Corporation,                     )
          Plaintiff,                )
                            )    MISC. No. _____
      v.                                  )
                            )    Northern District of Georgia
                            )    Case No. 1:07-CV-00286-BBM
INSURANCE DATA PROCESSING, INC.,          )
a Pennsylvania Corporation,               )
          Defendant.                )
                            )
                            )
                            )
AND RELATED COUNTERCLAIM.                  )
                            )

## SECOND DECLARATION OF ALMEDA HOWARD

I, ALMEDA HOWARD, state and declare as follows:

1.      I am a paralegal with the law firm of Carlton Fields, P.A., counsel for The Insurance House, Inc. ("Insurance House") in this matter.

2.      I am over the age of 18, suffer from no disability affecting memory or judgment, and make this declaration of my own volition.

3.      I make this declaration in connection with Insurance House's Response to Third Party ACE American Insurance Company's Opposition to Plaintiff's Motion to Compel Documents.

4.      I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify competently about them.

5.      I have read Third Party ACE American Insurance Company's Opposition

to Plaintiff's Motion to Compel Documents ("ACE's Opposition") and accompanying exhibits.

6.    In the second full paragraph on page 6 of "ACE's Opposition", ACE says, 'Therefore, Ms. Logan requested an extension of time to prepare ACE's response to the Subpoena but advised Ms. Howard that she did not yet know what that response would be.'

7.    Paragraph 9 of the Affidavit of Adrienne M. Logan, Exhibit "C" to "ACE's Opposition," states, "I therefore requested an extension of time to prepare ACE's response to the Subpoena but advised Ms. Howard that I did not know what that response would be."

8.    At no time during my conversation with Ms. Logan did she tell me that she did not know what ACE's response to the Subpoena would be.

9.    Ms. Logan told me that the search was in progress.

10.    Ms. Logan told me that, to date, they had not found any documents, and that they did not want to respond that they had no documents when, in fact, they had not had adequate time to search.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 13th day of June 2008, at Atlanta, Georgia.

Almeda Howard

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

- - -

THE INSURANCE HOUSE, :  CIVIL ACTION
INC., a Georgia        :
corporation,           :
                       :
        V.             :
                       :
INSURANCE DATA         :
PROCESSING, INC., a    :
Pennsylvania           :  NO.
Corporation            :  1:07-CV-0286-BBM

- - -

February 26, 2008

- - -

        Oral deposition of RANDY CROCE,
held in the offices of Ballard Spahr
Andrews & Ingersoll, LLP, 1735 Market
Street, 51st Floor, Philadelphia,
Pennsylvania 19103, commencing at 9:24
a.m. on the above date, before Teresa M.
Beaver, a Federally-Approved Registered
Professional Reporter and a Notary Public
in the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 JFK Boulevard
12th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

A P P E A R A N C E S :

Deposition of Randy Croce

191

1    ACIES-One?

2         A.    No.

3         Q.    Are you aware of any other

4    IDP client that was live with any module

5    of ACIES-One as of April 13th, 2005?

6         A.    Ace and SMIC -- oh, other

7    module -- I'm sorry.

8         Q.    We're talking about Ace,

9    INA?

10        A.    Right.

11        Q.    What modules was Ace live

12   with?

13        A.    Policy.

14        Q.    Policy as a stand-alone?

15        A.    Yes.

16        Q.    Are you aware of any other

17   IDP clients that were in production or

18   live with any other module of ACIES-One?

19        A.    No.

20        Q.    So, just to make sure I

21   understand, as of April 13th, 2005,

22   you're not aware of any IDP client that

23   was using more than one module of

24   ACIES-One?

25        A.    That's correct.

1180 West Peachtree St.      Suite 650      Atlanta, GA 30309

# EXHIBIT D

1       IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2            ATLANTA DIVISION
              -  -  -

3  THE INSURANCE HOUSE, :  CIVIL ACTION
   INC., a Georgia     :
4  corporation,       :

5        V.        :
                :
6  INSURANCE DATA    :
   PROCESSING, INC., a  :
7  Pennsylvania     :  NO.
   Corporation      :  1:07-CV-0286-BBM
8

9             -  -  -
10       February 27, 2008
11           -  -  -
12

       Oral deposition of GARY J.
13  GILBERT, held in the offices of Ballard
   Spahr Andrews & Ingersoll, LLP, 1735
14  Market Street, 51st Floor, Philadelphia,
   Pennsylvania 19103, commencing at 9:43
15  a.m. on the above date, before Teresa M.
   Beaver, a Federally-Approved Registered
16  Professional Reporter and a Notary Public
   in the Commonwealth of Pennsylvania.
17
18
19

             -  -  -
20
21    ESQUIRE DEPOSITION SERVICES
        Four Penn Center
22      1600 JFK Boulevard
          12th Floor
23   Philadelphia, Pennsylvania 19103
        (215) 988-9191
24

Gilbert

72

1  both financially and as well as in terms
2  of concepts and requirements for the new
3  system.
4           So, they agreed to do so and
5  that's what happened.
6      Q.     What was Ace's role?
7      A.     Ace?
8      Q.     Ace Insurance?
9      A.     Ace Insurance.   Somewhere --
10  I can't exactly remember the date -- I'm
11  going to say '02 or '03, I had had a
12  conversation with some folks at Ace
13  Insurance, just let's have lunch and talk
14  about what you are looking -- what you
15  are doing these days and what we are
16  doing and we got together and we had
17  lunch and we talked about their
18  reentrance into the personal lines market
19  and the kind of product that they were
20  looking for and I told them about our
21  development project.
22           They talked about a timeline
23  and I said that, you know, that that
24  wasn't in our future, to be able to do

Gilbert

1  would not have begun the implementation

2  for billing and claims because the client

3  wanted to wait for the 11 lines of

4  business to be installed?

5          A.    I don't know that I could

6  make that -- draw that same conclusion.

7                There's a business team

8  dedicated to Security Mutual and they may

9  work on many things at the same time.

10                They most likely work on

11  many things at the same time.

12          Q.    Would it be correct to

13  characterize Security Mutual, Franklin as

14  the first two clients that IDP had for

15  ACIES-One?

16          A.    As partners, yes, that would

17  be true.

18          Q.    Who was a client of

19  ACIES-One, if there was one, prior to

20  Security Mutual and Franklin?

21          A.    No one.  But I'm

22  characterizing them as partners as

23  opposed to clients.

24          Q.    Was Ace the first nonpartner

**Gilbert**

87

1    client for ACIES-One that IDP had?

2         A.        Yes.

3         Q.        How would you characterize

4    the relationship, the current

5    relationship between IDP and Ace, with

6    respect to the success or failure of

7    IDP's implementation of ACIES-One?

8         A.        Well, I guess that would be

9    purely conjecture.

10                  I do believe that they would

11   say that we had done an amazing job in a

12   short period of time.  They had made a

13   strategic decision to get out of personal

14   lines again.  And so they -- we completed

15   our contract with them.  I think they

16   actually paid us to get out of the

17   contract, because they were done in

18   personal lines.

19                  And but I do believe that

20   they would say that it was an amazing

21   implementation.

22        Q.        Would Security Mutual

23   characterize the implementation process

24   in the same manner?

**Gilbert**

207

1              Mary Ellen Leonard at

2    Security Mutual will say very positive

3    things about ACIES.

4              As a partner, they struggled

5    with us, through many early iterations of

6    the product.  And they have, I believe,

7    Mary Ellen would say very glowing things

8    about our product.

9              Let's see.  I haven't really

10   been involved in the billing module

11   implementations.  They really have been

12   going on this year.

13             FMI, again, was not -- they

14   don't know.  They are the partner that

15   doesn't -- is in no rush to get a

16   product.

17             Ace Insurance, Gerry --

18   Irish name -- that's helpful -- would say

19   very nice things about the ACIES system;

20   the speed with which the system was

21   installed at Ace, the talent of our

22   staff, the commitment to the client.

23             I -- I don't know, I don't

24   think this is wishful thinking, I believe

**ESQUIRE DEPOSITION SERVICES**

# EXHIBIT E

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF GEORGIA

 3                        ATLANTA DIVISION

 4     THE INSURANCE HOUSE, INC.)

 5                              )  NO.  1:07-CV-2086-BBM

 6              Plaintiff,      )

 7                              )

 8        -vs-                  )

 9                              )

10     INSURANCE DATA           )

11     PROCESSING, INC.,        )

12              Defendant.      )

13

14

15        Videotaped deposition of STACEY ADAMS, held

16     at 1735 Market Street, 51st Floor,

17     Philadelphia, Pennsylvania, on Friday, February

18     1, 2008, at 9:57 a.m., before Dolores M. Horne,

19     Shorthand Reporter and Notary Public, in and

20     for the Commonwealth of Pennsylvania.

21

22              ESQUIRE DEPOSITION SERVICES

23              1600 John F. Kennedy Boulevard

24              Philadelphia, Pennsylvania  19103
```

**Deposition of Stacy Adams**

1   Q.        At which time Randy Croce became the

2   engagement manager?

3   A.        Correct.

4   Q.        Until July of 2007?

5   A.        Correct.

6   Q.        When you essentially took over that

7   role again?

8   A.        Right.

9   Q.        Between the time that you had served

10  as engagement manager for Insurance House for

11  that first period ending in July of 2006 until

12  you served as engagements manager for Insurance

13  House again in July of 2007, had you undergone

14  any project management training?

15  A.        No.

16  Q.        Were you asked to?

17  A.        No.

18  Q.        Was any made available to you?

19  A.        No.

20  Q.        How many other IDP customers or

21  clients did you serve as engagement manager

22  for?

23  A.        When?

24  Q.        During your tenure at IDP.

Deposition of Stacy Adams

88

1    A.        As an actual engagement manager I

2    started acting in that role in July of 2002.

3    Q.        Okay.

4    A.        I would say for four.

5    Q.        Four clients?

6    A.        Four clients.

7    Q.        And Insurance House is one of the

8    four?

9    A.        Correct.

10   Q.        Was Armed Forces Insurance one of the

11   four?

12   A.        No.

13   Q.        Was Barnstable County Mutual Insurance

14   Company one of the four?

15   A.        Yes.

16   Q.        Was Ace INA one of the four?

17   A.        Yes, yes.

18   Q.        Are you currently serving as

19   engagement manager for an IDP client?

20   A.        No.

21   Q.        When was the last time you served as

22   an engagement manager for an IDP client?

23   A.        For a particular client it would be

24   for the certification effort for Insurance

Deposition of Stacy Adams

1  A.          -- there were four.

2  Q.          Okay.  Then my question was not clear.

3  You've been engagement manager for six

4  different customers at IDP?

5  A.          At different points in their project,

6  yes.

7  Q.          Okay.  Of the six how many had a go

8  live date that was understood by IDP at the

9  time that the client and IDP first entered into

10  their relationship?

11           MR. DINICOLA:  Objection to

12  form.

13           THE WITNESS:  First started

14  talking or signed a contract when you --

15  BY MR. BUBB:

16  Q.          I -- I understand that not all

17  contracts are signed before work begins?

18  A.          Uh-huh.

19  Q.          Let's say the beginning of the

20  relationship when IDP first started to perform

21  work for their client.  How many of the six

22  clients -- for how many of the six clients did

23  IDP understand there was a deadline for a go

24  live date or a projected go live date?

Deposition of Stacy Adams

99

1          MR. DINICOLA:  Objection to

2     form.

3          THE WITNESS:  I would say for --

4     for Ace when they first started working with us

5     we had a deadline to be in production and that

6     deadline changed a bit through the project.  So

7     the beginning of the project it may have been

8     projected to be one thing and in the end it was

9     adjusted for different reasons.  So it -- it

10     evolved throughout the project.

11          MR. DINICOLA:  Can we go off the

12     record for a second.

13          THE VIDEO TECHNICIAN:  Off tape,

14     12:55.

15          (Discussion off the record.)

16          THE VIDEO TECHNICIAN:  Back on

17     the record, 12:59.

18     BY MR. BUBB:

19     Q.     Did you serve at Barnstable as the

20     engagement manager for Barnstable from the

21     beginning of their -- from the beginning of

22     IDP's work for Barnstable?

23     A.     Yes.

24     Q.     Did you understand at the time that

1  Q.       When did they stop being an Acies

2  client?

3  A.       I believe at the end of 2006.

4  Q.       Prior to -- well, when you say they

5  stopped being an Acies client, does that mean

6  their contract expired or they've gone with

7  another product?

8  A.       They -- they terminated that portion

9  of the business.

10  Q.      Okay.  Were they live with Acies

11  One?

12  A.      Yes.

13  Q.      When did they first go live with Acies

14  One?

15  A.      The date that they first started using

16  it in production differed from the date that

17  they deemed it production ready.  So whereas

18  they approved a specific line for a specific

19  states as production ready, they didn't start

20  using it until after that.

21  Q.      Okay.  What was the date on which they

22  first deemed it production ready?

23  A.      I believe it was September or October

24  of 2002.

Deposition of Stacy Adams

108

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | And they started using it in |
| 3 | November. | |
| 4 | Q. | For the other three customers for whom |
| 5 | you served as an engagement manager -- | |
| 6 | A. | What -- |
| 7 | Q. | Well, Insurance House is one, right? |
| 8 | A. | (The witness indicates.) |
| 9 | Q. | Ace INA? |
| 10 | A. | Uh-huh. |
| 11 | Q. | Barnstable? |
| 12 | A. | Uh-huh. |
| 13 | Q. | And there were a total of six? |
| 14 | A. | Uh-huh. |
| 15 | Q. | So the three that we haven't named -- |
| 16 | A. | Uh-huh. |
| 17 | Q. | -- how many of them had in -- for how |
| 18 | many of them did you understand that they had a | |
| 19 | date they planned to go live with whatever | |
| 20 | portion of Acies One they had licensed? | |
| 21 | A. | An approximate date for three. |
| 22 | Q. | For all three? |
| 23 | A. | For -- |
| 24 | Q. | We're just talking about the three |

125

1    in the back end.

2    Q.        Okay.  Is the client one of the

3    clients that we've identified already in the --

4    during the deposition?

5    A.        Yes.

6    Q.        Which client is that?

7                  MR. DINICOLA:  Objection.  If

8    this is not public information about the

9    client, this is covered by our ongoing

10   confidentiality objection providing

11   confidential information related to other

12   clients.

13                 MR. ROBERTS:  Off the record.

14                 THE VIDEO TECHNICIAN:  Off tape,

15   1:30.

16                 (Whereupon a break was taken.)

17                 THE VIDEO TECHNICIAN:  Back on

18   the record, 1:35.

19   BY MR. BUBB:

20   Q.        When we went off the record there was,

21   I believe, a question on the table.  The

22   question was, you had identified -- you had not

23   identified.  You had reference a client of IDP

24   who had gone live with the web rating product

Deposition of Stacy Adams

126

1   that IDP had prior to its engagement with

2   Insurance House?

3   A.        Yes.

4   Q.        Who was the client?

5   A.        Ace.

6   Q.        Ace, however, as I understood you --

7   the last time you referenced the client, was

8   not -- the web rating product was not -- did

9   not have all of the functionality that the web

10  PPA product had?

11  A.        Correct.   They -- I can't really speak

12  to all the functionality they designed.   But

13  they built a set of screens to collect

14  information and IDP provided the rating engine

15  behind that.

16  Q.        Was that rating engine demonstrated to

17  Insurance House at the beginning of IDP's work

18  for Insurance House?

19  A.        I believe it was, yes.

20  Q.        Did Insurance House license that

21  rating engine or incorporate it?   Did IDP

22  incorporate it into something that Insurance

23  House licensed?

24                  MR. DINICOLA:   Objection to

**Deposition of Stacy Adams**

1  form.

2                THE WITNESS:  I guess I'm

3  uncomfortable speaking to the technology behind

4  what was provided to IH versus what was

5  provided for Ace.  I believe it to be

6  different.  Was it based on that, I believe it

7  was based on that but I believe it was -- it

8  was different.

9  BY MR. BUBB:

10  Q.        Okay.  And different meaning it had

11  additional functionality that the web rating

12  product did not have?

13  A.        Correct.  The functionality was added,

14  but I believe the product itself was a bit

15  different.

16  Q.        Okay.  Do you know if when IDP was

17  engaged with Insurance House and was designing

18  or working to design the Web PPA product

19  whether IDP was starting from -- from scratch

20  or were they adapting their web rating product

21  into the Web PPA product?

22                MR. DINICOLA:  Objection to

23  form.

24                THE WITNESS:  I can't really

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2008, I electronically filed "Plaintiff's Reply in Support of Its Motion to Compel Documents From Third Party Ace American Insurance Co." with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Katie A. D'Emilio, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 Market Street, 12th Floor
Wilmington, DE 19801

Mary E. Augustine, Esquire
Bayard P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

I hereby further certify that on June 13, 2008, I electronically filed "Plaintiff's Reply in Support of Its Motion to Compel Documents From Third Party Ace American Insurance Co." by regular first class mail, postage prepaid to the following:

Carl G. Roberts, Esquire
Damian L. DiNicola, Esquire
Ballard Spahr Andrews & Ingersoll LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Paul B. Bech, Esquire
Michael A. Shapiro, Esquire
Bazelton Less & Feldman, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19103

Thomas G. Macauley (ID No. 3411)

1851490.1